1                     UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK

2   ------------------------------------X
                                        :
3   MONACO,                             :
                                        :
4                  Plaintiff,           : 18-CV-04101 (VMS)
            v.                          :
5                                       : October 2, 2019
    THE HISTORIC OLD BERMUDA INN, INC., :
6   et al.,                             :
                                        : Brooklyn, New York
7                  Defendants.          :
                                        :
8   ------------------------------------X

9
          TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
10             BEFORE THE HONORABLE VERA M. SCANLON
                 UNITED STATES MAGISTRATE JUDGE
11

12  APPEARANCES:

13
    For the Plaintiff:        AMY ROBINSON, ESQ.
14                            JASON SOLOTAROFF, ESQ.
                              Giskan Solotaroff & Anderson, LLP
15                            90 Broad Street, Suite 10th Floor
                              New York, New York 10004
16
    For the Defendants:       JOSEPH BONOMO, ESQ.
17                            JOSEPH FARELLI, ESQ.
                              Pitta LLP
18                            120 Broadway, 28th Floor
                              New York, New York 10271
19

20  Court Transcriber:        SHARI RIEMER, CET-805
                              TypeWrite Word Processing Service
21                            211 N. Milton Road
                              Saratoga Springs, New York 12866
22

23

24

25

    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

3

1    (Proceedings began at 11:25 a.m.)

2              THE COURT:  All right.  Monaco v. Historic Old

3    Bermuda Inn, Inc., et al., 18-CV-04101.

4              For the plaintiff?

5              MR. SOLOTAROFF:  Jason Solotaroff and Amy Robinson.

6    Good morning, Your Honor.

7              THE COURT:  Okay.  And with you?

8              MR. SOLOTAROFF:  I have my client Gabriel Monaco.

9    We also have a legal assistant, Camille Sanchez as well.

10             THE COURT:  Okay.

11             MR. BONOMO:  Good morning, Your Honor.  Joseph

12   Bonomo from Pitta, LLP, on behalf of Old defendants.  And with

13   me I have Mr. Farelli, a partner from Pitta, LLP, as well.

14             THE COURT:  Okay.  I have a little bit of a

15   smorgasbord, I guess, of questions, so I'll try to keep them

16   together.  There are kind of two that are substantive, but let

17   me just deal with some of the less substantive ones first.

18   Okay, procedurally, I think that the -- again, if you disagree

19   with what I'm saying, let me know, that the parties need to

20   file the opt-in forms on the docket.  That's from 29 U.S.C.

21   Section 216(b).  So if you can do that.

22             MR. SOLOTAROFF:  Just for the main plaintiff, right,

23   Judge?

24             THE COURT:  No, I think the opt-in's for the FLSA.

25   Their opt-in forms need to be --

4

1          MR. SOLOTAROFF:  We didn't --

2          THE COURT:  -- on the docket.  You gave them notice,

3    and they sent in the claim form, right?

4          MR. SOLOTAROFF:  Right, but we didn't have them opt

5    in to -- we didn't do it that way, Judge.  In other words,

6    that --

7          THE COURT:  You don't consider those to be the opt-

8    in forms for the --

9          MR. SOLOTAROFF:  Oh.

10         THE COURT:  I mean that was how I was reading it.

11   If you think they're not --

12         MR. SOLOTAROFF:  I mean they don't have -- I mean I

13   guess we could do that, but I'm not sure it's necessary

14   because -- I mean the claims that are really being settled

15   because they cover the whole class period are the state

16   claims.

17         THE COURT:  Okay.  So let's talk about that

18   substantively.

19         MR. SOLOTAROFF:  Okay.

20         THE COURT:  Because that is one of my concerns.  I'm

21   not quite sure what you're trying to do, and probably I should

22   have recognized this the last time we were talking but I

23   didn't.  So the release is quite broad.  It includes FLSA

24   claims for the entire class.  That's the language.

25             So, hopefully I'm not going to bore everybody, but

1   the settlement agreement, it's on the docket at 30, released

2   claims are described as release class claims meaning "all

3   claims alleged in the complaint including those based on or

4   under federal law, the Fair Labor Standards Act, New York

5   state law, and the New York Hospitality Industry Wage Order,

6   and/or common law arising during the settlement period whether

7   known or unknown and that were or could have been asserted in

8   this action.  The released claims include but are not limited

9   to" and then it continues.

10           Okay.  So, that includes FLSA claims.  So my -- one

11  of my two big substantive concerns in this is that I believe

12  conceptually the position is that you represent something we,

13  you know, conclude this, you represent -- sorry, you

14  plaintiff's counsel represent all of the state law class

15  members for the six-year period who have any of these claims.

16  Then, there is, whatever they are, the FLSA claims.  I was

17  taking those claim forms as the equivalent of their opt-ins

18  because they were -- you know, because they were agreeing to

19  this and that would be the only way that you could be

20  representing them.

21           So, my substantive concern about the release is it

22  reads as if the -- you are releasing the federal claims for

23  the non-opt-ins, non-claiming class members.  So for a class,

24  that's conceptually correct, right?  If you don't opt out,

25  you're in, right, but for the FLSA, you have to opt in.  So

6

1   that's -- you know, considering that they had opted in.

2          And I think -- so I think that the -- maybe I'm

3   incorrect -- I'm totally open to being corrected -- that the

4   release is incorrect for releasing the non-claiming class

5   members New York -- I'm sorry, non-claiming class members FLSA

6   claims.  So that could potentially be a huge hiccup in this

7   case except in trying to figure out, well, what are those FLSA

8   claims in this case, I don't see them.  I mean this is not a

9   -- this is a case about the allegation that that service

10  charge was not a legitimate defendant-driven or defendant-

11  received charge.  It should have been considered tips, and

12  then because of that, they should have had a different pay

13  structure.

14         That's a New York claim, I think.  I mean I don't

15  know if you squeeze it into a box where somehow it is

16  affecting some agreed-upon wage and, you know, but we never

17  got into the details of, you know, how one could conceptualize

18  that as some kind of FLSA claim.  So correct me if I'm wrong

19  both as to the language in the settlement agreement and I

20  should actually -- let me find that.  There's one other part

21  of the settlement agreement, though, that -- let me find it.

22                    [Pause in proceedings.]

23         THE COURT:  Sorry.  Rachel, do you remember where

24  that other --

25         THE CLERK:  [indiscernible].

1          THE COURT:  Yeah.  So what I just -- I'm sorry, I'm

2   just going to ask my law clerk because we were looking at it

3   before.  There was the definition part, and that's where that

4   claim came up, but then there was the second part that kind of

5   made it less clear.

6                    [Pause in proceedings.]

7          THE COURT:  All right.  Well, there was one other

8   piece -- oh, yeah, sorry, this is what I was -- in Document

9   30-1.  It's on the docket as Page 4.  It's also marked as Page

10  2 of 4 of the document.  This is the statement in response to

11  Question 5 which was what claims are being released.  And in

12  there, it reiterates a version of, you know, this release

13  class claims language.

14          But then on the next page -- so we're looking at

15  Page 5 of 7 of 30-1, it has this, "In addition to the claims

16  described above, if use of any claim form and release, you

17  will release on behalf of yourself and each of your heirs,

18  representatives, successors, assigns, and attorneys shall have

19  fully, finally, and forever settled and released all claims

20  that are in the class action complaint under the Fair Labor

21  Standard Act including" and then it goes on.

22          So, you know, that reads more like an opt-in.

23  Anyway, okay, what's your view of what's going on here?

24          MR. SOLOTAROFF:  All right.

25          THE COURT:  Where we should be in terms of -- are we

8

1   settling the FLSA claims or is this really just all about New

2   York?  And then I should say the follow-on then would be if

3   anyone ever thought they had an FLSA claim which I don't know

4   what their claim would be, there's probably a very strong

5   argument for satisfaction.  But --

6               MR. SOLOTAROFF:  Okay.

7               THE COURT:  -- go ahead.

8               MR. SOLOTAROFF:  So, Judge, first of all, I want to

9   apologize that we got this to you so late.  It was a total

10  screw up on our part and so I apologize for that.

11              THE COURT:  It's okay.  I really made my law clerk's

12  --

13              MR. SOLOTAROFF:  I apologize.

14              THE COURT:  We were here late talking about it, but

15  she had to work harder.

16              MR. SOLOTAROFF:  I apologize to her then.  So, I

17  think that the arguable FLSA claim is a minimum wage claim

18  because of if the gratuities were not distributed -- I mean

19  the [indiscernible] have a kind of peculiar case system.  I

20  don't know if you recall where some were paid in cash, some

21  was paid in check.

22              THE COURT:  This whole case is peculiar because I

23  don't know, I'll just, you know, make an observation to

24  defendants, this whole issue about service charges was

25  litigated more than a decade ago.  I think I mentioned, you

9

1  know, I had handled a case that was like this, so how you

2  ended yourself in this pickle, I don't know.  But whatever.

3  We're trying to like make things match up to --

4          MR. SOLOTAROFF:  So, theoretically, there could be a

5  FLSA claim if in fact the money that they got as wages plus

6  the flat-fee kind of gratuity payments that they received

7  didn't equal minimum wage.  We don't actually -- based on our

8  analysis, we did not think that Ms. Monaco at least who we're

9  obviously most familiar with --

10          THE COURT:  Right.

11          MR. SOLOTAROFF:  -- had a minimum wage claim.  But

12  the defendants naturally --

13          THE COURT:  But so, you know, flag that.  That's an

14  issue in and of itself because then could she represent

15  somebody who did have an FLSA claim?  I mean --

16          MR. SOLOTAROFF:  Well, she has as much of an FLSA

17  claim as probably anyone else did.  So, but --

18          THE COURT:  So, but right.  So if she doesn't have

19  one, where are we?

20          MR. SOLOTAROFF:  Right.  Well, but the defendants

21  obviously as Your Honor is familiar with like when they're --

22  when they're paying money, they want every possible

23  theoretical claim released.

24          THE COURT:  Right.  No, I get it why they want it.

25  I'm saying procedurally where are we at with this?

10

1          MR. SOLOTAROFF:  So, but then moving on, my

2   understanding of it is that the way -- I'm sure you'll correct

3   me if I'm wrong, but the way opt-ins -- the opt-in class

4   action works is that you get your chance to opt in and if you

5   don't opt in, then you don't have -- you run the risk of

6   losing your claim.  You just can't --

7          THE COURT:  Why?  You're not barred by --

8          MR. SOLOTAROFF:  Because that's --

9          THE COURT:  -- you're not barred by the

10   circumstance.  It's just the statute of limitations tends to

11   run out for people.

12          MR. SOLOTAROFF:  Okay.

13          THE COURT:  So, you know, if there's 50 potential

14   opt-ins you sent the mailing to and 25 of them say, hey, we'd

15   love to join it, well, then you represent 25 individuals on

16   their FLSA claims.

17          MR. SOLOTAROFF:  The other people --

18          THE COURT:  The other 25 still have their FLSA

19   claims.  It's just the clock keeps ticking.  This is, you

20   know, probably people do have some -- I mean if there is a

21   claim, there are like still some of them and the statute of

22   limitations period given that this was a pretty quick

23   turnaround on the resolution, but --

24          MR. SOLOTAROFF:  Okay.  So, I understand what you're

25   saying.

1          THE COURT:  -- they don't lose their claims.  Sort

2  of that's the key difference between the opt-in and --

3          MR. SOLOTAROFF:  Okay.

4          THE COURT:  -- you know, the class.

5          MR. SOLOTAROFF:  So then I understand then the

6  concern about the release and I mean I don't know what the

7  defendants want to do about that.  I mean there are obviously

8  a number of ways to solve this problem.

9          THE COURT:  All right.  Let's go through the other

10 issues.  If you want to take, you know, once we've talked

11 about them, take a break and see what you want to do.  It goes

12 to the practical question of does anybody really have an FLSA

13 claim.  I mean from the limited information I have here it

14 doesn't seem like they do, but obviously I haven't like run

15 everybody's numbers.  This seems potentially to have

16 benefitted employees.  I don't know.  I mean that -- anyway,

17 all right.  So that's the substantive question and it, you

18 know, tags then do you need to file these opt-in claims so

19 that we know who we're covering here.

20          Okay.  Let me ask you a couple of smaller questions

21 then.  So where are you at with the person who filed the

22 untimely claim?  It's mentioned in the docket at 33 at Page

23 11.  What I was a little surprised at, you know, your brief

24 suggests the administrator is the one who's making that

25 decision.  I'm not sure that's right.  I mean if you agree

1    that that person is included, that's great, fine.  If you

2    don't, then I think I should be deciding whether that person

3    should be included or not.  So where are you at with --

4            MR. SOLOTAROFF:  Well, I guess our reading of the

5    settlement agreement was that the claims administrator had the

6    discretion to decide whether -- but it's one person.

7            THE COURT:  Yeah, it's not a lot.

8            MR. SOLOTAROFF:  So I actually suggested to defense

9    counsel we just include this person because they did have an

10   explanation for why they filed late that they were away.

11           THE COURT:  Okay.

12           MR. SOLOTAROFF:  So I'm fine with just including

13   that person.

14           MR. BONOMO:  No objection, Your Honor.

15           THE COURT:  Okay.  So that person's in.  Then, what

16   -- this is going to lead into my other substantive question.

17   How much -- your brief says the recovery -- this is Page 13 --

18   that the average payout per class member would be

19   approximately $3,000.  How do you get to that?

20           MR. SOLOTAROFF:  Okay.  Well, first of all, that's

21   -- I mean it's as good as I could do, but it's not the most

22   informative number because the numbers are going to depend --

23   like are going to vary widely based on how long you work

24   there.  And we don't -- I mean the claims administrator has

25   the information, but I don't have it about, you know, how much

1   each [indiscernible].  So what I did is I just took the number

2   of claimants and divided it by 180,000, and that's how I got

3   3,000.

4          THE COURT:  All right.  Because I don't think that

5   could be right unless you -- well, it just doesn't seem like

6   --

7          MR. SOLOTAROFF:  I mean it includes fees, but why

8   wouldn't it.

9          THE COURT:  Yes, that's why I said it's going to

10  dovetail with my next question.  But this can -- it's very

11  hard to know that you have an average of 3,000 because you may

12  be front-loaded on people who have very small claims, you

13  maybe have people who have the older or longer claims, right.

14  I mean --

15         MR. SOLOTAROFF:  Right.  You would have to do -- and

16  we could do that, an analysis of --

17         THE COURT:  Well, let me make sure I understand.

18  But there's a reversion here, right?

19         MR. SOLOTAROFF:  No.

20         THE COURT:  No, all right.  Then we don't understand

21  this.

22         MR. SOLOTAROFF:  Except for five -- except for

23  there's a $5,000 like fund that's set aside for like any late

24  claims.

25         THE COURT:  Yeah, for late people.

1          MR. SOLOTAROFF:  Yeah, which, you know, given that

2   there's been one so far, I mean we could talk about what to do

3   with that.  But, no, there isn't a reversion and so these

4   people will do, you know --

5          THE COURT:  Well, then we misunderstood how your

6   division of the monies go.  So can you explain it to me?

7          MR. SOLOTAROFF:  All right.  So, there's a total sum

8   of $180,000.  Off of that comes attorney's fees of we'd ask

9   for a third, which include the claims administrator's fee.

10  So, we're including they got an excellent deal from the claims

11  administrator, so it ends up -- so that's -- so then there's

12  $120,000 left to distribute to the class.  And that will be

13  divided based on weeks of service so that if -- I mean there's

14  a math formula in there which --

15         THE COURT:  But weeks -- let me just --

16         MR. SOLOTAROFF:  So that if you -- oh, right.  And

17  then you have to -- I'm sorry, thank you.  And then there's

18  subtract the service award that we've requested from Ms.

19  Monaco.

20         THE COURT:  Right.  Right.

21         MR. SOLOTAROFF:  Plus the $5,000.

22         THE COURT:  Right.

23         MR. SOLOTAROFF:  And then the remainder is

24  distributed to the class.  To the authorized claimants.

25         THE COURT:  To the?

1          MR. SOLOTAROFF:  Authorized claimants.

2          THE COURT:  Right.  So, I guess what we do not

3  understand is that is it right the denominator is not the

4  total -- the denominator is the total number of weeks worked

5  by the claimants?

6          MR. SOLOTAROFF:  Yes, Judge.

7          THE COURT:  And then you've got whatever percentage

8  that you got from that.

9          MR. BONOMO:  Your Honor?

10         THE COURT:  Mm-hmm.

11         MR. BONOMO:  If I may jump in?

12         THE COURT:  Yep.

13         MR. SOLOTAROFF:  Please.

14         MR. BONOMO:  Our understanding of that is different,

15  to say the least.

16         THE COURT:  What's yours because I obviously had a

17  different one?

18         MR. BONOMO:  Our understanding is that the gross

19  settlement amount of the 180,000 would be set aside into a

20  fund that the claims administrator would use to distribute

21  payments to plaintiff's counsel, expenses, use that for

22  funding the mailing of the notices.

23         THE COURT:  Right.

24         MR. BONOMO:  Basically all claims administration,

25  paying out the service awards to the named plaintiff if

16

1   approved by the Court or in any amount that's approved by the

2   Court, putting aside $5,000 into the reserve fund for late

3   claims or something --

4            THE COURT:  Right.

5            MR. BONOMO:  -- brought under extraordinary

6   circumstances.  And the balance of that which is there's a

7   window of that, it could be, you know, between 90 to 120.

8            THE COURT:  Right.  That was our guess, 110 to 120.

9            MR. BONOMO:  Okay.

10            THE COURT:  Somewhere, I don't know, something like

11   that.

12            MR. BONOMO:  Right, in that window that would be

13   used to fund those that submit timely and correct forms.

14            THE COURT:  Okay.  So wait --

15            MR. BONOMO:  As a result of that, the denominator,

16   as we perceive it and how we've understood this settlement

17   agreement to provide, would be the total amount of tenured

18   weeks for all class members.

19            THE COURT:  Yes, that is what we thought.

20            MR. BONOMO:  And then those that authorized or

21   timely and correctly submit claim forms, the total number,

22   which I believe is about 62, including named plaintiff would

23   be 63 would be the numerator.  And the differential --

24            THE COURT:  Sorry, go ahead.

25            MR. BONOMO:  And the differential between the

1 numerator and the denominator would actually revert back after

2 six months if no claim forms were submitted for those other

3 120 in addition to the reserve fund if there were no late

4 claims and any amounts of unclaimed checks, meaning going out

5 to authorized claimants and them not cashing it after I

6 believe a 15-month period.

7        THE COURT:  That's what we thought it was so that if

8 you -- just to make up numbers here -- if there were ten --

9 hypothetically there have been ten employees and one person

10 worked one-tenth of it and another person worked, you know, a

11 fifth or two-tenths of it, and then the other -- anybody else

12 who worked the remaining seven-tenths of it never show up,

13 that money never -- the money that would cover those hours, it

14 never gets paid out.  There's no extra money given to the

15 others.

16        MR. BONOMO:  The people that didn't -- right.

17        THE COURT:  And I think at least one place where we

18 got that idea from is just first the brief.  And I don't know,

19 maybe this kind of goes both ways.  Let me find it.  Is 3.5 in

20 the settlement agreement -- thanks, sorry.  I'm just borrowing

21 the law clerk's copy.

22        Okay.  So, 3.5 -- this is Page 16 of 22.  "First,

23 each class member" -- I'm sorry, I'm looking at sub A, "First,

24 each class member's individual tenure of employment is

25 calculated by weeks worked during the settlement period.

1  Tenure will be determined."  Such -- or blah, blah, blah.

2          Percentage allocation, "Second, each class member's

3  percentage is calculated by taking the individual class

4  member's employment tenure as the numerator and dividing it by

5  the total work weeks for all class members during the

6  settlement period as the denominator.  The denominator for

7  each class member will be the same number.  As a result of

8  this calculation, the total of all class members' numerators

9  must equal the denominator.  Thus, the class member's adjusted

10 employment tenure divided by the sum of all settlement work

11 weeks for all class members equals his or her individual

12 percentage allocation."

13          So, that would be right.  Hypothetically, just

14 making up numbers, over this period there were a hundred weeks

15 worked by whatever staff there is, right.  And we get a claim

16 from Person No. 1 and that person worked a hundredth of it,

17 and then somebody else comes in and they worked, you know,

18 two-tenths -- two-hundredths of this, right, one-fiftieth.

19 Then, nobody else ever showed up, then it's three of a

20 hundredth.  Three-hundredths of that money is going to be paid

21 out because we've looked at the entire work -- the whole --

22          MR. BONOMO:  The universe of work we've --

23          THE COURT:  -- all the work that was done that could

24 have generated --

25          MR. BONOMO:  That's correct.

```
1              THE COURT:  -- the tips and all of the money that --
2    your service fees, however one describes it, that should have
3    been paid out.  And there's no, you know, no boondoggle to
4    somebody who, you know, if only three of you or two of you
5    show up representing three-hundredths of the work, you know,
6    you're not going to get everybody else's money.  That's how we
7    -- that's how I read what this text says.  Now if --
8              MR. SOLOTAROFF:  That's correct.
9              THE COURT:  -- plaintiff, you have a different view.
10             MR. BONOMO:  This is the first I'm hearing that --
11   this is --
12             THE COURT:  You know --
13             MR. SOLOTAROFF:  No, Judge, it --
14             THE COURT:  I mean for us it raised a whole other
15   set of issues we haven't touched on yet, but --
16             MR. SOLOTAROFF:  No, I think -- Judge, I think
17   you've --
18             THE COURT:  Or are we reading it wrong?
19             MR. SOLOTAROFF:  I think you've read it correctly.
20   I think, you know, that wasn't -- I mean it's our -- that's
21   the agreement that -- I agree that that's what the agreement
22   says.
23             THE COURT:  Okay.  That's good.  I mean, you know, I
24   had jet lag, she was working late.  I'm like, oh my gosh, did
25   we get this wrong.  It's totally possible we got it wrong, but
```

1    I think this is what it says.

2            Okay.  So now -- and this is -- but given that you

3    weren't sure that that was your agreement, I'm not sure how

4    much what I'm going to say next is in play.  I think a

5    reversion structure creates a potential conflict or conflict,

6    depending on potentially more facts that I have, between class

7    counsel and the class members.

8            Now, this is -- what I'm going to say is not any

9    kind of, you know, personal or professional suggestion that

10   anybody wasn't vigorously representing their clients.  This is

11   an observation about what that structure that we just

12   clarified that is what is said in the text here may give rise

13   to.  So, right now -- and, again, I'm just going to give

14   hypothetical numbers, right.  You have a complete pot of

15   $180,000.  Probably, just for round numbers, 60 of it goes to

16   class counsel and expenses just so I can have a nice, you know

17   -- there's 120 to get divided.

18           We have the 60-something people who show up.  I'm

19   guessing that they represent a third of the work.  And so,

20   that means 40,000 will be paid out; 80,000 will revert.  If

21   more people had showed up, maybe more money would be paid out.

22   But if nobody had showed up or hardly anyone had been showed

23   up, plaintiff's counsel would still and the plaintiff -- you

24   know, whatever, the $60,000 would still be in play for counsel

25   and the named plaintiff.

1          And so, there's no relationship between the money

2   paid under the structure other than the named plaintiff, no

3   relationship between the success and what plaintiff's counsel

4   is getting.  And so, I have that as an analytical question

5   about what to do about that.  And, you know, I'll ask you.

6   You can tell me what you think now or if you want to think

7   about it, do a little research, give me more submissions.

8          Two helpful cases talking about this.  One, it

9   doesn't really resolve it, it just makes the observation, but

10  in a case called <u>International Precious Metals Corporation v.</u>

11  <u>Waters</u>, which is 120 S.Ct. 2237 from 2000, this was Justice

12  O'Connor speaking to the denial of a petition for a writ of

13  certiorari.  She describes the case and the district court had

14  approved a fee award that was more than twice the amount of

15  the class's actual recovery.

16          She observed in a case called <u>Boeing case v. Van</u>

17  <u>Gemert</u>, 444 U.S. 472 from 1980 that the court had upheld an

18  award of attorney's fees in a class action where the award was

19  based on the total fund available to the class rather than the

20  amount actually recovered:

21               "We had no occasion in Boeing, however, to address

22               whether there must at least be some rational

23               connection between the fee award and the amount of

24               the actual distribution to the class.  The approval

25               of attorney's fees absent any such inquiry could

22

1       have several troubling consequences.

2       "Arrangements such as that at issue here decouple

3       the class counsel's financial incentives from those

4       of the class increasing the risk to actual

5       distribution will be misallocated between attorney's

6       fees and plaintiff's recovery that potentially

7       undermine the underlying purposes of class actions

8       by providing defendants with the powerful means to

9       enticing class counsel to settle lawsuits in a

10      manner detrimental to the class."

11      And she goes on to say basically she thinks that the

12  court should take up the issue.  And then another helpful case

13  well, I could say I'm not totally sure about the basis for the

14  resolution, is a case called Grice, G-R-I-C-E, v. Pepsi

15  Beverages Company.  It was 363 F.Supp.3rd 401 from this year

16  from the Southern District.  And it's from Judge Oetken.  You

17  know, there's a lot of discussion about the various numbers,

18  but he talks about how the reversion structure can, as Justice

19  O'Connor said, "decouple the incentive structure."

20      So, I think that problem is here, but I'm not sure

21  where one goes with it because there seems to be couple of

22  [indiscernible].  One saying no, there's actually not a

23  problem.  Two, these numbers still -- even if there was the

24  potential that, you know, hardly anyone showed up and there

25  was hardly any money paid out, that's not the case here.  You

23

1  got a third, basically a third response, and that's pretty

2  good for a, you know, mode of modest wage-related case and

3  with a moderately transient population given that it's the

4  restaurant industry.

5          And so, you know, the decoupling as a question of

6  fact didn't happen here.  I don't know if that's true.  That

7  was why I was asking that question about, you know, is it

8  $3,000 like what's actually being paid out here.  I understand

9  you don't have those numbers at your fingertips, but I'm

10  guessing they're available from the administrator.  And, you

11  know -- bless you -- you know, is it right to go with the one-

12  third, you know, with all the details that were just mentioned

13  earlier or should this be basically a fee application?

14          You know, there are some judges -- I generally have

15  not been one of them, but I haven't dealt with this in the

16  class action context very much -- you know, who think that a

17  one-third is okay in an FLSA case, you know, as long as it's

18  not completely unreasonable in relation to size of the case.

19  I haven't found an unreasonable case yet.  But there are other

20  judges who think you have to look and do the Lodestar analysis

21  and then consider what the multiplier would be.

22          You know, I think the hourly rates here are too

23  high.  I'm not saying your client's don't pay you, but you

24  know, they're not in line with this district in FLSA cases.

25  But if you adjusted them to what I think would probably be the

1  upper level of FLSA numbers, you know, you could approximate a

2  number that might be -- is less than what you're asking for

3  but it's still fine.  And then if you got a multiplier, you

4  would end up close.  But I'm not sure what the right

5  analytical approach is here, but I think this problem is

6  present here.  This may not have been something you were

7  anticipating given that you thought you had a different

8  settlement agreement, so I don't -- you know, I don't know.

9       And then another consideration here which isn't

10 really one that was talked about in either of the two cases I

11 mentioned is you did work with -- like the concern is that

12 there's collusion or something else that, you know, has rung

13 improper, whatever, disincentives or disincentives for

14 settlement.  You know, you worked -- number one, you're all

15 experienced.  There's no issue.  I don't suspect any issue

16 here, and you worked with an experienced mediator who

17 obviously implicitly thought this was okay.

18      But I think it's in the structure, not in, you know,

19 anyone's conduct that the problem arises.  So, what's the

20 right way to look at it and where should it end up?  Is there

21 information we should take into account?  I mean I think for

22 your benefit, you know, I imagine none of you want to keep

23 spending a lot of time and money on this.  Judge Oetken's case

24 is very helpful in, you know, describing what the problem is

25 as is the Justice O'Connor statements.  So --

1        MR. SOLOTAROFF:  Well, let me say this, Judge.

2   There was some confusion, clearly and -- but given the

3   confusion, we -- I mean --

4        THE COURT:  You were never -- you never had -- as a

5   practical matter, you never had the disincentive that is other

6   rights of the structure.

7        MR. SOLOTAROFF:  Also, we didn't -- I mean we did

8   everything we could, and Ms. Robinson's -- you know, we -- in

9   order to keep the costs of the claims administrator down, we

10  internalized the contact with the clients so they called us.

11  And Ms. Robinson talked to, I don't know --

12       MS. ROBINSON:  At least a dozen, maybe 15 or 20

13  potential claimants.

14       MR. SOLOTAROFF:  People and we -- you know, we

15  encouraged them to make claims.  And Your Honor is right, it's

16  a somewhat transient population of people who, first of all,

17  you know, move around, although we were able -- you know, it's

18  not a situation where the claims administrator couldn't find

19  these people.  I mean pretty much everything was delivered.

20  So we didn't in the end.  But for whatever reason, you know,

21  two-thirds of the people decided that they didn't want to

22  pursue it and they didn't think it was going to be a lot of --

23  I don't know.

24       But, you know, I think what we did here which is

25  important is that -- is that -- and I don't think Your Honor

26

1   -- I don't think we've ever explained it well enough is that

2   the problem here was that they would collect a service fee

3   that was unquestionably meant for gratuities but instead of

4   distributing it to the clients -- to the employees, they would

5   just kind of do it arbitrarily and say, okay, it's a large

6   wedding so everybody gets 50 bucks.  It's a birthday party, so

7   everybody gets 35 bucks.

8           And that's not the right way to do it.  And we

9   called attention to it, and I presume that they're not doing

10  that anymore because if they are, they're going to get sued

11  again.

12          THE COURT:  Let me just ask on the defendants' side,

13  do you agree that that's what your contracts say because I

14  haven't seen them?

15          MR. BONOMO:  I wouldn't necessarily agree with that

16  the way it was articulated, but I do agree that there is a

17  system in place where you need workers to work smaller events

18  and there would be disincentive to the worker to work that

19  event because they know there's not going to be a good tip.

20  They put a system in place where there's a guarantee.  So

21  regardless of the event, there's a guaranteed amount that

22  you're going to receive.

23          THE COURT:  But I think, at least as I understood

24  it, there's no -- they were paid -- at least they were paid

25  minimum wage, right?

```
 1              MR. BONOMO:  Yes.

 2              THE COURT:  All right.  So, this is not a tip case.

 3    So this -- what I was alluding to in terms of the previous

 4    litigation, the issue is as I understand it is what does your

 5    contract with your customers say such that are they under the

 6    misimpression that monies are going to the workers or -- and

 7    that's what they're paying and so they're -- the customers --

 8    your direct customers and their guests are disincentivized to

 9    make tip?

10              MR. SOLOTAROFF:  Absolutely.

11              THE COURT:  But I think that sort of the practical

12    -- I mean this is just my real-life observation is nobody goes

13    -- actually, I said this to my clerk last night.  Nobody

14    except my brother goes to a party and tips the waiter.  I mean

15    my brother has always liked tipping them.  I'm like you're the

16    guest of the person whose party this is.  You don't tip their

17    staff.  And so the -- although, you know, there was a whole

18    line of litigation, you know, ten or fifteen years ago about

19    this issue about what the contract said, so if people were

20    disincentivized.  So that's why I was asking about what your

21    contract said.

22              So, it's only a problem, I think, if the contract

23    creates this problem because otherwise the fact that your

24    clients get a bonus for working certain kinds of jobs --

25              MR. BONOMO:  Your Honor?
```

1          MR. SOLOTAROFF:  Yeah, but the contract says it's  a

2   service charge, Judge.

3          THE COURT:  But that's been ambiguous in New York.

4          MR. BONOMO:  But it conspicuously says that they are

5   not retaining any portion of it.  And what the system that

6   they use that allows them to roll over --

7          THE COURT:  Okay.

8          MR. BONOMO:  -- our position is that that is

9   completely lawful because --

10          THE COURT:  Right.

11          MR. BONOMO:  -- the minimum wage order says the

12   employer shall not retain.  Our position is that they are not

13   retaining it.  It's going into an account that's being used to

14   pay out over time --

15          THE COURT:  Right.

16          MR. BONOMO:  -- as opposed to paying out on a weekly

17   basis, which the law doesn't say it can't be done.

18          THE COURT:  And so the -- right, so the follow-on to

19   the point about what representation is made to the customer

20   and what message is conveyed to the customer and their guests

21   is is anybody disincentivized to pay a tip.  And do you -- is

22   it tied to the contract or something else --

23          MR. BONOMO:  It's tied to both the --

24          THE COURT:  I mean that's just the question and it's

25   why I think, as far as I can tell from the numbers, basically

1   you took a 50/50 chance.  This could go either way.  You'd

2   have to go through all the documents, talk about what

3   everybody did and it may or may not be a lawful practice

4   depending on all of these pieces.  And so we just don't know.

5   This might be a good claim, this might be like forget it.

6   Nobody's getting any money.

7            MR. SOLOTAROFF:  It depends on the details, Judge.

8   And to be more specific --

9            THE COURT:  Right.

10           MR. SOLOTAROFF:  -- so when we originally had

11  records relating to Ms. Monaco, it looked like there was money

12  being retained.  But then, defendants gave us documents for a

13  longer period of time, a sampling.  When you look at those

14  documents, it didn't look like money was being retained.  But,

15  of course, we did not necessarily trust the documents.  But

16  for us to go, we'd have to do it event by event over six years

17  to see whether money -- whether the amount paid out to the

18  employees was greater or less than the service charge.

19           THE COURT:  No, I agree.

20           MR. SOLOTAROFF: Yeah.

21           THE COURT:  This would be a big accounting effort,

22  and it makes a lot of sense for this to be a class and it

23  makes sense for everybody to take the position that this is a

24  complete toss-up.  Like I don't think there's a problem with

25  the amount of money that you extrapolated was likely -- not

1  likely, that could have been owed.  And it makes perfect

2  business sense for the defendants to have entered into it.

3  And like that Cheeks level aspect of this and the fairness, I

4  don't have an issue with it.

5          This is just about like the questions are about the

6  -- a reversion structure in a set amount.  I mean -- you know,

7  collapsing the -- I understand there's like -- you know,

8  there's money for counsel, money for expenses, money for the

9  administrator, money for the named plaintiff.  But just

10 lumping that all together, that is not tied to the actual

11 recovery.  And so, as Judge Oetkin and Justice O'Connor wrote,

12 I think that's a policy matter and a fairness matter open to

13 real problems because of the structure.

14         And so, then the question I put to you to just, you

15 know, take away all of the details of this case is and a court

16 is approving or being asked to approve a settlement and make a

17 fee -- approve a certain amount of fees when this is the

18 settlement structure, what should be considered in either

19 approving what I'm going to summarize is the one-third

20 arrangement or given this conflict, should I use some other

21 way of assessing the fees, for example, considering it as if

22 it were a fee application and a straight, you know, Lodestar

23 with, you know, potentially some kind of enhancement or

24 multiplier which depending on how one looked at those numbers

25 would be similar, less.

1          But then it's, you know, not -- the analytical

2    upside to that is just that it's not affected by the recovery.

3    You evaluate, you know, the work that you did to get even that

4    first person paid.  I don't know.  I don't know the answer to

5    the question.  I mean even Judge Oetkin who's, you know --

6          MR. SOLOTAROFF:  Smart.

7          THE COURT:  -- whose opinion, super, super smart has

8    this kind of mixed result which, you know, you have to read

9    the details of the case to just sort out.  I don't know.  You

10   could look at it different ways.  He gave them 22 percent of

11   the total amount or he gave them roughly a third when you look

12   at, you know, another combination of numbers.  I don't know.

13         MR. SOLOTAROFF:  Judge, I think one important aspect

14   to all this is what the actual results are because if in fact

15   the people -- and this could have happened or could not have

16   happened, but one would think it did happen is that the people

17   who worked there, you know, who had the most to gain were the

18   ones who submitted claims.  So, if in -- so in other words --

19         THE COURT:  Right, which means -- so that's a big --

20         MR. SOLOTAROFF:  So I think we should look into

21   that, Judge.

22         THE COURT:  That's a very big unknown here, right.

23   I mean --

24         MR. SOLOTAROFF:  And I think we should before we go

25   further --

32

1          THE COURT:  Right.

2          MR. SOLOTAROFF:  -- I would be more comfortable if

3    we found that out.

4          THE COURT:  Okay.  So, maybe just like a couple of

5    other points and then we can just talk about a date that works

6    for you all to make --

7          MR. SOLOTAROFF:  And, Judge, before --

8          THE COURT:  Sure.

9          MR. SOLOTAROFF:  -- can Ms. Monaco, you know,

10   [indiscernible] and took time.  Do you have any questions for

11   her because if we could deal with those today, that would be

12   great so she doesn't have to come back the next time, if

13   that's possible.  But if you want her to come back, she'll

14   come back.

15         THE COURT:  No.

16         MR. SOLOTAROFF:  Okay.

17         THE COURT:  I mean you're here.  That sort of was

18   the compressed submission, so there isn't anything.  I don't

19   think -- I didn't see anything.

20         MR. SOLOTAROFF:  Okay.

21         THE COURT:  No.  I mean --

22         MR. SOLOTAROFF:  Okay.

23         THE COURT:  -- she did a lot of work.  The other

24   couple of things are really administrative.  So, again, you

25   know, we were looking at this last night, but what I see is

33

1  the analytics sheet.  Is there something else that has your

2  expenses on it?

3          MR. SOLOTAROFF:  Oh, Judge, you know, I think that

4  we didn't -- we'll submit that.  It's --

5          THE COURT:  Okay.

6          MR. SOLOTAROFF:  -- they're very few.  There's --

7  it's really just

8          THE COURT:  Service.

9          MR. SOLOTAROFF:  -- the filing fee and the mediator.

10          THE COURT:  Okay.

11          MR. SOLOTAROFF:  But we'll -- I thought -- I'm

12  sorry.  We should have submitted that.

13          THE COURT:  Okay.  All right.  So that's the

14  analytics numbers are at 32 on the docket, Page 4, but I don't

15  see the others.

16          You mentioned in your papers that there were

17  undeliverable notices.  They were all successfully remailed;

18  is that right?

19          MR. SOLOTAROFF:  That's my understanding, Judge.

20          THE COURT:  Okay.  All right.  If you find that it's

21  something other than that, can you let me know?

22          MR. SOLOTAROFF:  Yeah.

23          THE COURT:  And you've agreed on the record here

24  that that person who allegedly had the untimely claim you're

25  going to consider it timely and include that person in the

34

1    settlement.

2            Let me just look over my papers.

3            Did I miss anything?

4            THE CLERK:  No.

5            THE COURT:  No, I think we got it all.

6                    [Pause in proceedings.]

7            THE COURT:  Oh, we're just going back to that point

8    about -- that we started at about whether you need to file the

9    claim forms.  I think you do because I think they're opt-ins

10   because -- well, I guess we're sort of back but my suggestion

11   is that you talk to the defendants' counsel about what exactly

12   is going on here and you verify for the record --

13           MR. SOLOTAROFF:  So, in other words, if there are --

14   if we do have -- the first issue identified, Judge, is that

15   the release is too broad regardless.

16           THE COURT:  Yeah.

17           MR. SOLOTAROFF:  So that's going to have to change.

18           THE COURT:  Right.  It includes class members who

19   did not opt in, and I'm considering the class -- the form

20   submission claim forms to be the opt-ins.

21           MR. SOLOTAROFF:  Got it.  So that's going to have to

22   be changed.  And however we change that will determine if we

23   could drop the FLSA claims entirely --

24           THE COURT:  Yeah.

25           MR. SOLOTAROFF:  -- in which case we wouldn't have

1  to file the claim forms.

2          THE COURT:  Yep.

3          MR. SOLOTAROFF:  Okay.

4          THE COURT:  Yes.  Okay.  Anything else?

5          MR. BONOMO:  Just to be clear, Your Honor, we are

6  saying that those that -- those class members that did timely

7  and correctly submit claim forms are also releasing their Fair

8  Labor Standards Act claims.  The issue we're concerned about

9  is those that are what I'll call the limbo class members that

10 don't do anything.

11         THE COURT:  I think plaintiff's counsel is trying to

12 reserve on that as to whether those were as I was

13 characterizing them opt-ins or if you're updating the

14 settlement.

15         MR. BONOMO:  Well, because the claim form itself

16 does state that by submitting the claim --

17         THE COURT:  Yeah, yeah.  Yeah, I agree.

18         MR. SOLOTAROFF:  Right.

19         THE COURT:  I mean the way I read the deal and you

20 can negotiate something different and if it doesn't adversely

21 affect anyone even though they didn't have -- it wasn't in the

22 mailing, that would probably be okay.  The way I think you

23 have the deal is you have a class and whether they opted --

24 whether they filed a claim for it or not, they're bound by the

25 decision here and the agreement.

1           And then sub to that is the structure of this is it

2   does include reversion, and that's the deal that the class

3   members are in.  And then those who filed the claim form, that

4   claim form is also an opt-in into the FLSA collective action.

5   And by doing that and taking the money, they're settling those

6   -- their claims.  But the missing piece is those who do not

7   file a claim form never opted in.  If they never opted in, the

8   plaintiffs don't represent plaintiffs and -- sorry,

9   plaintiff's counsel doesn't represent them.  They're not

10  parties to this case, and it can't be bound.

11          The practical discussion I was just, you know,

12  flagging earlier is I don't really know what those claims are,

13  and that's really just a -- I don't know, trying to put on the

14  record a question really for defendants' counsel, is there

15  such a fundamental problem with this settlement that you're

16  not happy with it because there's two-thirds of the class

17  could come back and claim that they had unsatisfied FLSA

18  claims, but I don't know that they have any FLSA claims given

19  that to me this seems to be a New York claim about tips.

20          I don't have as full a record as you do, and I'm

21  not, you know, binding in anything.  It was just an

22  observation in trying to articulate what the concerns are so

23  that, you know, you have your conversation and you come back

24  to me with, you know, a clear statement of what your positions

25  are on this so that we know when we're -- you know, if this is

37

1  approved, which I think it's a good deal for, you know, the

2  people who are here.  It's just whether, you know, you're all

3  on the same page as to, you know, you're getting what you're

4  expecting --

5              MR. SOLOTAROFF:  Okay.

6              THE COURT:  -- by paying this money out.  Okay.  Is

7  there anything else?

8              MR. SOLOTAROFF:  No, Judge.

9              THE COURT:  All right.  Just I need a timeline by

10 when you're going to get back to me.  I think a letter just

11 giving me your response.  Hopefully you're in agreement on the

12 response, but if you're not, a joint letter.

13             MR. SOLOTAROFF:  I think we could get a letter to

14 you in two weeks, Judge.  Is that fine?

15             THE COURT:  Does that work?

16             MR. BONOMO:  That's good, Your Honor.

17             THE COURT:  Okay.  Does that take into account the

18 next holiday, school's being out or whatever?  It's fine.  I

19 mean it's --

20             MR. SOLOTAROFF:  That's fine with me.

21             THE COURT:  -- everybody --

22             MR. SOLOTAROFF:  And then we -- then will we --

23 should we schedule a time to come back or not necessary?

24             THE COURT:  I want to see what you say.

25             MR. SOLOTAROFF:  Okay.

38

1          THE COURT:  If it's satisfactory.

2          MR. SOLOTAROFF:  So by the 16th, Judge.

3          THE COURT:  Satisfactory.  Yep.

4          Okay.  All right.  That's it.  Thank you.

5          MR. SOLOTAROFF:  Thank you, Judge.

6          THE COURT:  Thanks, Ms. Monaco.  You don't need to

7   come back.

8          MS. MONACO:  Thank you.

9          THE COURT:  You're welcome if you want to, but you

10  don't have to.

11          MS. MONACO:  Thank you, Your Honor.

12          MR. BONOMO:  Thank you, Your Honor.

13  (Proceedings ended at 12:14 p.m.)

14                      *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

39

1      I certify that the foregoing is a court transcript from
2  an electronic sound recording of the proceedings in the above-
3  entitled matter.

4
5  _____
6                    Shari Riemer, CET-805
7  Dated:  October 3, 2019
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25